UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

RAJAGOPALA SAMPATH RAGHAVENDRA,      :
Founder, Racial Equality
Struggles for Columbia University    :
Employees (Rescue) Ad Hoc
Committee, also known as Randy S.    :
Raghavendra,
                                     :     08 Civ. 8120 (PAC)(HBP)
                    Plaintiff,
                                     :     REPORT AND
     -against-                             RECOMMENDATION
                                     :
NATIONAL LABOR RELATIONS BOARD,
et al.,                              :

                    Defendants.      :

----------------------------------X

          PITMAN, United States Magistrate Judge:

          TO THE HONORABLE PAUL A. CROTTY, United States

District Judge,


I.   Introduction

          Plaintiff Rajagopala Sampath Raghavendra, proceeding

pro se, commenced this action against his former employer, the

Trustees of Columbia University ("Columbia"), Lee Bollinger

(collectively, the "Columbia Defendants"), the National Labor

Relations Board ("NLRB"), Celeste Mattina (collectively, the

"NLRB Defendants"), Laura Barbieri and Schoeman, Updike &

Kaufman, LLP, alleging employment discrimination, civil rights

violations, violations of plaintiff's rights under the National

Labor Relations Act, 29 U.S.C. §§ 151-69 ("NLRA"), and various common law claims.

Two motions are before the Court.  By two separate notices of motion dated December 22, 2008 (Docket Items 25 and 43), the NLRB Defendants and Barbieri move for orders pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, dismissing the claims that apply to them.  In the alternative, Barbieri moves to consolidate any surviving claims against her with the federal action that plaintiff filed in 2006, Docket No. 06 Civ. 6841 (PAC)(HBP) ("the 2006 action").  Plaintiff opposes defendants' motions.

For the reasons set forth below, I respectfully recommend that the NLRB Defendants' and Barbieri's motions to dismiss be granted.

## II.  Facts[1]

Plaintiff alleges the following facts.  Plaintiff is a 48-year-old self-described "Black (Dark-skinned) male of East-Indian Race" with two masters' degrees, in mechanical/industrial engineering and business administration (Verified Complaint (Amended May 18, 2009) in 08 Civ. 8120 (PAC)(HBP), sworn to May

---

[1]I read plaintiff's complaint with the leniency normally accorded a pro se plaintiff.  See Haines v. Kerner, 404 U.S. 519, 520 (1972); In re Sims, 534 F.3d 117, 133 (2d Cir. 2008).

20, 2009 ("Am. 2008 Compl.") ¶¶ 4, 6).[2]  He was employed by
Columbia in a non-supervisory position from November 26, 2001
until September 23, 2005, when he was terminated (Am. 2008 Compl.
¶ 27).  Plaintiff claims to have performed his duties and respon-
sibilities at Columbia in an excellent and superior fashion (Am.
2008 Compl. ¶¶ 27-28).

    A.  Relevant Events
       During Plaintiff's Employment

     In 2002 and 2003, William Scott, who supervised plain-
tiff's immediate supervisor, made comments that plaintiff per-
ceived to be harassing and racially disparaging (Amended Verified
Complaint in Index No. 112148/06 in Supreme Court of the State of
New York, sworn to June 19, 2008, annexed to Notice of Removal in
09 Civ. 0019 (PAC)(HBP), dated Jan. 5, 2009 ("2009 Compl."),
¶¶ 34-43).[3]  Beginning in the fall of 2002, plaintiff repeatedly

---

    [2]While defendants' motions to dismiss were pending in the
2008 action, plaintiff filed an amended complaint.  <u>See</u>
Fed.R.Civ.P. 15(a).  Because plaintiff's amended complaint is
subject to the same arguments as his original complaint, I treat
defendants' motions as if they were addressed to the amended
complaint.

    [3]As described in greater detail in the text, plaintiff has
filed several complaints in several different actions describing
events that allegedly occurred during and after his employment
with Columbia.  The allegations in plaintiff's complaints are not
entirely uniform; some alleged events are set forth in some of
plaintiff's complaints but not in others.  Although the motions
addressed in this Report and Recommendation are made in 08 Civ.
8120 only, I cite certain allegations set forth in only 09 Civ.
                                                     (continued...)

sought a promotion to Manager of Finance, a supervisory position, but was unsuccessful (2009 Compl. ¶ 52). Columbia did not initially post openings for the position internally, employed an outside executive search firm which suggested "predominantly White candidates" for the position, and Columbia eventually hired Jennifer Fabrizio, a White female from outside Columbia, on October 29, 2002 (2009 Compl. ¶¶ 53, 55-57, 62).

As a result of Scott's comments and Columbia's hiring of Fabrizio, plaintiff filed internal complaints with Columbia's Human Resources and Equal Employment Opportunity offices in November 2002, January 2003 and February 2003, alleging a pattern and practice of racial discrimination in executive promotions and hiring in his department (2009 Compl. ¶¶ 61, 65-66). Notwith-standing plaintiff's complaints, none of Columbia's departments conducted an investigation into plaintiff's allegations (2009 Compl. ¶¶ 64-66). At unspecified times, his supervisor or other Columbia executives "suggested [that plaintiff was] a 'terrorist' and[/]or [was] primarily valued only for having 'Black Face,'" his office space was "repeatedly violated," and he "was subject to and was painfully aware of numerous and almost continuous

---

[3](...continued)
0019 in an effort to recount plaintiff's narrative in a coherent fashion. Allegations that are set forth in 09 Civ. 0019 but not in 08 Civ. 8120 play no part in my recommended disposition.

incidents[4] of blatant discrimination, harassment, and intimida-
tion of other Black and minority employees and students at
[Columbia] in general" (Am. 2008 Compl. ¶ 321).  In July 2003,
plaintiff filed a lawsuit in New York State Supreme Court alleg-
ing employment discrimination against Columbia and naming his
supervisor as a defendant (the "2003 Action") (2009 Compl. ¶ 71).

In February 2004, plaintiff alleges that while he was
on vacation, IRED staff "hired and directed by Scott and [Karen]
Fry" "basically ransacked and abused" plaintiff's office space to
"harass" plaintiff for filing the internal complaint and commenc-
ing the 2003 Action (2009 Compl. ¶ 74).

In March 2004, plaintiff sent an internal memorandum to
Elizabeth Keefer, Columbia's General Counsel, and Colleen Crook-

---

[4]Although plaintiff alleged several other examples of racist
incidents at Columbia, none of them occurred in the office or
department where he worked (Am. 2008 Compl. ¶¶ 31 (drawings of
nooses and hate mail received by professors in 2009), 35 & Ex. A
(noose hung on Black professor's door in 2007), 44 (students'
anti-affirmative action events as well as racist cartoon and
jokes), 41, 48-53 (civil actions and complaints by Columbia
employees and professors, one of whom worked in "equal
opportunity" department, complaining of racist speech from
supervisors and other unspecified sources)).  Plaintiff also
claims that Bollinger was "insensitive" to the racism on campus
exemplified by these incidents because he "refused to punish the
perpetrators of the most racist speech" at Columbia (Am. 2008
Compl. ¶¶ 43, 58)).  From these allegations, plaintiff infers
that Columbia and its executives "maintain[ed] an 'Apartheid-
Style' racist work environment for . . . Blacks and other
minorities" and indeed that Bollinger "condon[ed] racial
discrimination and harassment at Columbia," and allowed racist
treatment to be common practice in various departments (Am. 2008
Compl. ¶¶ 59, 322).

er, its Vice President of Human Resources, requesting that they "clarify" official Columbia policy concerning his organizing a minority employees association (2009 Compl. ¶¶ 116-17).  Plaintiff alleges that, in response, Crooker, with the advice and collaboration of Barbieri, reprimanded him for, among other things, misusing Columbia stationery, although plaintiff describes the reprimands as "false/fake," "contain[ing] vicious lies, false allegations and malicious representations" and "apparently concocted in an attempt to falsify or fabricate evidence and . . . to illegally intimidate plaintiff" from organizing a minority employees association (Am. 2008 Compl. ¶¶ 122, 174).  According to plaintiff, Barbieri also, as part of an alleged conspiracy with unspecified other defendants, falsely suggested to plaintiff's former attorney that plaintiff's minority employees association proposal related to and was intended to advance plaintiff's July 2003 employment discrimination lawsuit (Am. 2008 Compl. ¶¶ 171-72).  As a result, Barbieri threatened to take unspecified disciplinary action against plaintiff "through his [former] attorney" (Am. 2008 Compl. ¶ 171).

          Over the next several months, plaintiff alleges that he was denied the use of a private office, and was asked to share a small office with "two other temporary/hourly waged employees during most of his employment" (2009 Compl. ¶ 45).  Scott assigned plaintiff to share a mailbox with another dark-skinned

clerical employee, but did not require other less-senior and lower-level White employees to do so (2009 Compl. ¶¶ 45-46). Furthermore, plaintiff claims that he was denied promotions, upgrades, and certain preferred work assignments (Am. 2008 Compl. ¶ 173; see also 2009 Compl. ¶¶ 51-53 (describing specific position for which plaintiff was very well qualified, but for which hired White candidate was unqualified)).

Plaintiff alleges that Columbia executives denied him "'acting executive' assignments" as well as other benefits and privileges of his employment, and maintained a hostile work environment strategically, with the "counsel[], assist[ance] and[/]or encourage[ment]" of Barbieri, in an attempt to force plaintiff to quit and, thus, prevent his organizing a minority employees association (Am. 2008 Compl. ¶¶ 173, 176-79). In August 2005, plaintiff's attorney informed him that Barbieri had e-mailed him to ask "what [it would] take to get [plaintiff] out of Columbia" (Am. 2008 Compl. ¶ 177).

On or about September 7, 2005, plaintiff wrote another internal memorandum to Columbia administrators, asking whether they objected to "the Black and other minority employees of Columbia exercising their Free Speech, Civil Rights and NLRA rights" to establish the proposed minority employees association (Am. 2008 Compl. ¶ 111). At or about 9:30 a.m. on Friday, September 23, 2005, plaintiff's supervisor terminated his employ-

ment by ordering him to pack up his belongings immediately in front of a white security officer and another white supervisor, all White individuals (Am. 2008 Compl. ¶ 134).  Plaintiff was then "paraded through the office in front of all the other (lower-grade) Black/Minority employees" (Am. 2008 Compl. ¶ 134). Plaintiff alleges that Scott wrote plaintiff a letter informing him that he was terminated, "after prior consultation and [with the] consent" of Bollinger and Robert Kasdin, the Senior Executive Vice President of Columbia (2009 Compl. ¶¶ 162, 173). Barbieri also allegedly advised and assisted the Columbia executives in their decisions to terminate and refuse to re-hire plaintiff, and in formulating the allegedly pretextual reasons for those decisions, as evidenced by the fact that Barbieri was copied on almost all of Columbia's communications with him (Am. 2008 Compl. ¶¶ 179-82).

B.   <u>Events Following Plaintiff's Termination</u>

1.   <u>Internal Grievance Procedures</u>

Following plaintiff's termination, Kasdin allegedly "enticed" plaintiff to participate in Columbia's internal grievance procedures (Am. 2008 Compl. ¶ 157).  Plaintiff alleges that the rules of Columbia's grievance procedures prohibited him from filing charges with any governmental agencies (Am. 2008 Compl. ¶ 154).  A hearing before a neutral factfinder was eventually

scheduled for April 26, 2006, after "repeated" postponements (Am. 2008 Compl. ¶ 158).  Plaintiff claims that on April 25, 2006, Columbia's Director of Labor Relations advised plaintiff by email that Columbia had decided to terminate its internal grievance procedures (Am. 2008 Compl. ¶ 159).

2.  First NLRB Charge and Appeal

In September 2006, plaintiff filed his first charge with the NLRB's Regional Office, alleging "racially-motivated NLRA violations" at Columbia (Am. 2008 Compl. ¶¶ 204-05).  However, the NLRB's attorney, a White individual in an office where the only "Black or other dark-skinned minority personnel . . . were either secretarial or other lower-level clerical staff," allegedly advised plaintiff "almost immediately" that his charge would be dismissed (Am. 2008 Compl. ¶¶ 207-08).  Plaintiff claims that the NLRB's attorney and investigation staff, who were initially "borderline courteous" to plaintiff, "quickly turned extremely hostile and unfriendly" and plaintiff "had to seriously struggle and engage in some heated arguments" with them in order to draft and file his charge (Am. 2008 Compl. ¶¶ 205-06).  According to plaintiff, the NLRB attorney "insisted on keeping plaintiff's [charge] extremely brief and without any details" (Am. 2008 Compl. ¶ 207).

Mattina, the Region 2 Director of the NLRB, subse-
quently dismissed plaintiff's first charge on the ground that it
was not filed within six-months of plaintiff's termination and
was, therefore, untimely (Am. 2008 Compl. ¶¶ 12, 216).   Plaintiff
claims that Mattina refused to conduct "any meaningful investiga-
tion" or to allow an administrative law judge to review his
charge, even though she was "well aware" that plaintiff had
pursued internal grievance procedures following his termination
which is what caused the six-month limitations period to expire
(Am. 2008 Compl. ¶¶ 215-16).   Plaintiff alleges that the NLRB
Regional Office has a history of dismissing any charges alleging
NLRA violations concerning "Black or other racial minorities[']
organizing for their mutual aid and protection in the workplace,"
but has been "extremely vigilant in the protection of White
employee groups' NLRA rights (Am. 2008 Compl. ¶¶ 209, 212).

Plaintiff appealed Mattina's decision to the General
Counsel of the NLRB, who dismissed his appeal (Am. 2008 Compl.
¶ 217).

### 3.   Second NLRB Charge and Appeal

In August 2007, plaintiff filed a second charge with
the NLRB's Regional Office alleging that Bollinger was violating
the NLRA by refusing to hire plaintiff for any other position at
Columbia (Am. 2008 Compl. ¶ 220).   Plaintiff claims that an NLRB

10

attorney "immediately advised" plaintiff that his charge would be
dismissed, even though it was filed within six months of Bol-
linger's refusal to re-hire him, and even though the attorney did
not know or understand plaintiff's new allegations (Am. 2008
Compl. ¶ 221).  Plaintiff insisted on filing his charge anyway
(Am. 2008 Compl. ¶ 220) and alleges that "Mattina and her all-
White investigative staff . . . made it extremely clear that they
w[ould] simply not conduct any meaningful investigation[] whatso-
ever . . . against . . . Columbia . . . on behalf of any NLRA
rights of the Black and other minority employees" (Am. 2008
Compl. ¶ 223).  In October 2007, plaintiff claims that an NLRB
attorney told him that Mattina would dismiss his second charge if
he did not withdraw it immediately, and plaintiff was "forced to
withdraw" his charge (Am. 2008 Compl. ¶¶ 224-25).  Plaintiff
appealed to the General Counsel, as well as to each of the five
NLRB board members, who apparently took no action (Am. 2008
Compl. ¶¶ 225-26).

### 4.   Third NLRB Charge

In December 2007, plaintiff filed a third charge
alleging "continuing NLRA violations at Columbia . . . and their
continuing illegal retaliation and refusal to re-hire him," along
with a 56-page affidavit (Am. 2008 Compl. ¶ 227).  Six days
later, Mattina dismissed the charge, and plaintiff alleges that

11

she did so "without any supporting NLRA caselaw whatsoever and apparently without even reading a single page" of plaintiff's supporting affidavit (Am. 2008 Compl. ¶ 228).  Plaintiff once again appealed to the General Counsel, who denied the appeal in May 2008, without providing "any supporting NLRA case law or any other legal authority whatsoever" (Am. 2008 Compl. ¶¶ 255-56). The General Counsel also denied plaintiff's requests for oral argument, as well as his requests for extensions of time to obtain an attorney and the participation of members of the United States Congress (Am. 2008 Compl. ¶¶ 267-68).  Plaintiff subsequently filed a motion for reconsideration with the General Counsel, which was also denied (Am. 2008 Compl. ¶¶ 269-70).

While plaintiff was filing his charges and appeals with the NLRB, he also "repeatedly filed several complaints with the NLRB Inspector General," alleging that Mattina and the General Counsel abused their discretion, were derelict in their duties, and violated plaintiff's constitutional rights, and requesting that the Inspector General conduct an investigation (Am. 2008 Compl. ¶ 259).  The Inspector General denied plaintiff's requests (Am. 2008 Compl. ¶ 259).

### 5.   Events at Columbia
During NLRB Proceedings

Plaintiff goes on to allege that, while he was filing his charges with the NLRB, Barbieri, presumably on behalf of

Columbia, threatened to sue plaintiff for defamation, libel, and state statutory violations if he attempted to "publicly speak out about the NLRA rights of the Columbia Minority employees" (Am. 2008 Compl. ¶¶ 148-50).  Columbia and Barbieri also allegedly "objected and illegally threatened him" in an unspecified manner if he placed notices or advertisements in local newspapers that urged any Columbia employees who were victims of discrimination and harassment to exercise their rights for their mutual aid and protection or to participate in any potential class action litigation against Columbia (Am. 2008 Compl. ¶ 149).  As a result, plaintiff claims he was not "able to communicate with any of the employees of [Columbia] for [the purpose of] organizing the proposed [minority employees association] and[/]or a poten- tial Class Action" (Am. 2008 Compl. ¶ 152).  Furthermore, Colum- bia and Barbieri allegedly discouraged plaintiff from obtaining support and legal assistance from faculty at other academic institutions by threatening him, again in an unspecified manner (Am. 2008 Compl. ¶¶ 148-52).  According to plaintiff, this series of events demonstrated that Columbia, its executive officers and its attorneys engaged in and carried out a "conspiracy of direct intimidation to suppress the NLRA rights . . . [and] send the loud and clear message of continuing subjugation of the Black and other minorities [of Columbia]" (Am. 2008 Compl. ¶ 147).

In June or July 2007, Columbia officials, including
Bollinger, informed plaintiff by letter that he would not be
hired for any position at Columbia (Am. 2008 Compl. ¶ 219).
Nevertheless, between July 2007 and May 2009, plaintiff continued
to apply for over 60 positions at Columbia at or below his level,
including "the lowest level" clerical and "part-time data-entry"
positions (Am. 2008 Compl. ¶¶ 162-63).   Plaintiff was not hired
for any of these positions (Am. 2008 Compl. ¶ 163).   Plaintiff
claims that he has been unemployed since his termination, and is
on the verge of bankruptcy and an unidentified foreclosure (Am.
2008 Compl. ¶ 29).

C.   Procedural History

1.   The 2003 Action

Plaintiff filed his first action in New York State
Supreme Court in July 2003, alleging that Columbia, Scott and Fry
subjected him to a pattern or practice of illegal discrimination
and retaliation by harassing plaintiff and failing to promote
him, in violation of state and federal laws (Plaintiff's Affida-
vit in Support of Motion for Remand in 2009 Civ. 0019 (PAC)(HBP),
sworn to Jan. 29, 2009, Docket Item 7 ("Pl.'s Aff. to Remand"),

¶ 4; Amended Verified Complaint, dated Aug. 15, 2007, annexed as Ex. A to Pl.'s Aff. to Remand, at 1).[5]

2.   The 2009 Action

In 2006, plaintiff filed a second action in New York State Supreme Court against Columbia, Kasdin, Scott and Fry, allegedly to avoid statute of limitations related problems that might arise out of the transfer of his 2003 Action and to include additional allegations of on-going discrimination and retaliation (Pl.'s Aff. to Remand ¶ 4).  Plaintiff later amended this second state complaint on or about June 19, 2008 to add Joseph Ienuso and Susan Rieger as defendants (Notice of Motion for Leave to Amend Complaint in Index number 112148/06, dated June 19, 2008, annexed as Ex. F to Pl.'s Aff. to Remand).  Columbia, Kasdin, Scott, Fry, Ienuso and Rieger removed this action to this Court on January 5, 2009 (Notice of Removal, dated Jan. 5, 2009, Docket Item 1 in 09 Civ. 0019).

These Columbia defendants filed a motion to dismiss 09 Civ. 0019 in part and a motion to consolidate all remaining claims on January 12, 2009 (Memorandum of Law in Support of the Columbia Defendants' Motion to Dismiss the Complaint in Part and to Consolidate All Remaining Claims, dated Jan. 12, 2009).  As

_____

[5]Plaintiff amended his 2003 Action in August 2007, and the New York Supreme Court subsequently transferred the action to New York County Civil Court.

15

noted above, their motions have been withdrawn without prejudice
to renewal.

      3.  <u>The 2006 Action</u>

      On April 5, 2006, plaintiff filed a charge with the New
York State Division of Human Rights and the United States Equal
Employment Opportunity Commission ("EEOC") alleging illegal
retaliatory discharge, but not alleging discrimination on the
basis of race, color and national origin in Columbia's failure to
promote or re-hire plaintiff (Verified Complaint in 06 Civ. 6841
(PAC)(HBP), sworn to May 18, 2007 ("2006 Compl."), annexed as Ex.
2 to Declaration of Susan Friedfel, Esq., dated June 26, 2009
("Friedfel 2009 Decl."), ¶ 16).  On November 3, 2006, plaintiff
received a right-to-sue letter from the EEOC (2006 Compl.,
annexed as Ex. 2 to Friedfel 2009 Decl., ¶ 16).[6]

      Meanwhile, on September 6, 2006, plaintiff filed a
complaint in this Court against Columbia, Bollinger, Kasdin and
Scott, which he subsequently amended on two occasions to include
additional federal and state law claims.  I shall refer to the
second (most-recent) amended version as the "2006 Complaint"
(2006 Compl., annexed as Ex. 2 to Friedfel 2009 Decl.).  Defen-

---

[6]Plaintiff subsequently filed a charge with the EEOC
alleging discrimination on the basis of race, color, national
origin and age, in Columbia's failure to promote or rehire, but
has not yet received a right-to-sue letter.

dants moved to dismiss the 2006 Complaint, which motion was granted in part and denied in part.  Raghavendra v. Trustees of Columbia Univ., 06 Civ. 6841 (PAC)(HBP), 2008 WL 2696226 at *13 (S.D.N.Y. July 7, 2008).

    4.  The 2008 Action

        Plaintiff filed a fourth complaint against Columbia and Bollinger, as well as the NLRB, Mattina and Barbieri, in this Court on September 19, 2008, alleging, at least as to Columbia and Bollinger, violations of many of the same federal and state statutes that were asserted in his 2006 and 2009 actions.  Among other things, plaintiff claimed that the Columbia Defendants violated 42 U.S.C. § 1981 ("Section 1981"), Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., the New York State Human Rights Law, N.Y. Exec. Law § 296 (the "NYSHRL") and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 (the "NYCHRL"), by "depriving . . . plaintiff of his NLRA rights based on race, color, national origin and retaliation . . . for complaining thereof, including his wrongful discharge . . . and repeated refusal to re-hire him" and that the NLRB Defendants and Barbieri violated Section 1981, the NYSHRL and the NYCHRL by aiding and abetting the Columbia Defendants in doing so (Verified Complaint in 08 Civ. 8120 (PAC)(HBP), sworn to Sept. 17, 2008 ("Orig. 2008 Compl."), annexed as Ex. 1 to Declaration of Susan

17

Friedfel, Esq. in Support of Columbia Defendants' Motion to Dismiss, dated Dec. 22, 2008 ("Friedfel 2008 Decl."), ¶¶ 370, 375).  Plaintiff also claimed that the NLRB Defendants had refused to enforce the NLRA, based on his and other discriminated-against Columbia employees' race, color and national origin, in violation of his First, Fifth and Fourteenth Amendment rights, for which he sought relief pursuant to 42 U.S.C. § 1983 ("Section 1983"), and that the NLRB Defendants had abused their discretion in failing to enforce the NLRA against Columbia, in violation of the Administrative Procedure Act, 5 U.S.C. § 500 et seq. (the "APA").

In addition to damages, plaintiff seeks an Order permanently directing Columbia and the NLRB, but not Mattina or Barbieri, (1) to reinstate him immediately to his previously held position or, in the alternative, to one of the lower-level positions for which he applied, (2) to permit the establishment of a minority employees association at Columbia that would allow for minority employees' mutual aid and protection and collective organization against institutionalized racial discrimination, and (3) not to engage in any direct intimidation and retaliatory threats against victims of discrimination and harassment who communicate with Columbia employees and numerous other listed types of political and civil rights organizations for their mutual aid and protection (Am. 2008 Compl. at 97-98).

18

Defendants filed briefs in support of their motions to dismiss the 2008 action or, in the alternative, to consolidate any remaining claims with plaintiff's other federal actions on December 22, 2008 (Memorandum of Law in Support of the Federal Defendants' Motion to Dismiss, dated Dec. 22, 2008 ("NLRB Br."); Memorandum of Law in Support of Defendant Barbieri's Motion to Dismiss, dated Dec. 22, 2008 ("Barbieri Br."); Memorandum of Law in Support of the Columbia Defendants' Motion to Dismiss, dated Dec. 22, 2008 ("Columbia Br.")).  Plaintiff simultaneously filed an amended complaint and a brief in opposition to defendants' motions on May 22, 2009 (Plaintiff's Memorandum of Law in Opposition to Defendants' 12(b)(6) and 12(b)(1) Motion[s] to Dismiss, dated May 22, 2009 ("Pl.'s Opp.")).  Plaintiff's amended complaint in the 2008 action realleges all of the material factual allegations set forth in his original complaint in the 2008 action.  Columbia and Bollinger subsequently submitted a motion to dismiss the amended complaint or, in the alternative, to consolidate plaintiff's claims with his other federal actions (Memorandum of Law in Support of the Columbia Defendants' Motion to Dismiss the Amended Complaint and, in the Alternative, to Consolidate any Remaining Claims, dated June 26, 2009 ("Columbia Am. Br.")).

III.  <u>Analysis</u>

   A.  <u>NLRB Defendants' Motions</u>

       The NLRB Defendants move to dismiss plaintiff's claims against them for violations of the NYSHRL, the NYCHRL, Section 1981, Section 1983, Section 1985 and the NLRA pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, for lack of subject matter jurisdiction.  In the alternative, the NLRB Defendants move to dismiss plaintiff's claims for failure to state a claim pursuant to Fed.R.Civ.P. Rule 12(b)(6).

       "Where a Court is asked to rule on a combination of Rule 12 defenses, it will pass on the jurisdictional issues before considering whether a claim is stated in the complaint." <u>Sunrise Indus. Joint Venture v. Ditric Optics, Inc.</u>, 873 F. Supp. 765, 769 (E.D.N.Y. 1995); <u>see</u> <u>also</u> <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 94-95 (1998) ("The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'"), <u>quoting</u> <u>Mansfield, C. & L.M.R. Co. v. Swan</u>, 111 U.S. 379, 382 (1884); <u>Arrowsmith v. United Press Int'l</u>, 320 F.2d 219, 221 (2d Cir. 1963) (<u>en</u> <u>banc</u>) ("[L]ogic compel[s] initial consideration of the issue of juris-diction . . . .  [A] court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim . . . .");

Hertzner v. U.S. Postal Serv., 05-CV-2371 (DRH)(ARL), 2007 WL
869585 at *3 (E.D.N.Y. Mar. 20, 2007) (same); Harrison v. Potter,
323 F. Supp.2d 593, 598 (S.D.N.Y. 2004) ("A court should consider
a motion under Federal Rule of Civil Procedure 12(b)(1) prior to
the merits of a claim because the substantive merits thereafter
'become moot and do not need to be determined.'"), quoting Rhulen
Agency, Inc. v. Alabama Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d
Cir. 1990).  I shall, therefore, address defendants' jurisdic-
tional defense under Rule 12(b)(1) before turning to any other
defenses.

     1.   Legal Standards Governing
          Motions to Dismiss for Lack
          of Subject Matter Jurisdiction

       The standards applicable to a motion to dismiss for
lack of subject matter jurisdiction have been comprehensively set
forth by the Honorable Denise L. Cote, United States District
Judge, in Cromer Finance Ltd. v. Berger, 137 F. Supp.2d 452, 467
(S.D.N.Y. 2001):

> In assessing a motion to dismiss for lack of subject
> matter jurisdiction, a court must "accept as true all
> material factual allegations in the complaint," Ship-
> ping Fin. Serv. Corp. v. Drakos, 140 F.3d 129, 131 (2d
> Cir. 1998) (citing Scheuer v. Rhodes, 416 U.S. 232, 236
> (1974)), but refrain from "drawing from the pleadings
> inferences favorable to the party asserting [jurisdic-
> tion]." Id. (citing Norton v. Larney, 266 U.S. 511,
> 515 (1925)).  Courts evaluating Rule 12(b)(1) motions
> "may resolve the disputed jurisdictional fact issues by
> reference to evidence outside the pleadings, such as
> affidavits." Zappia Middle East Constr. Co. v. Emirate

of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000).  Where
jurisdiction is "so intertwined with the merits that
its resolution depends on the resolution of the mer-
its," the court should use the standard "applicable to
a motion for summary judgment" and dismiss only where
"no triable issues of fact" exist.  London v.
Polishook, 189 F.3d 196, 198-99 (2d Cir. 1999) (cita-
tion omitted); see also Europe and Overseas Commodity
Traders, S.A. v. Banque Paribas London, 147 F.3d 118,
121 n.1 (2d Cir. 1998).

(alteration in original); see also Morrison v. Nat'l Austl. Bank
Ltd., 547 F.3d 167, 170 (2d Cir. 2008); Arar v. Ashcroft, 532
F.3d 157, 168 (2d Cir. 2008), reh'g en banc granted (2d Cir. Aug.
12, 2008); Makarova v. United States, 201 F.3d 110, 113 (2d Cir.
2000); Friends of Hamilton Grange v. Salazar, 08 Civ. 5220 (DLC),
2009 WL 650262 at *12 (S.D.N.Y. Mar. 12, 2009); Espada v. N.Y.
Bd. of Elections, 07 Civ. 7622 (SAS), 2007 WL 2588477 at *2
(S.D.N.Y. Sept. 4, 2007).  The party asserting that the court has
subject matter jurisdiction bears the burden of proving the
court's jurisdiction.  FW/PBS, Inc. v. City of Dallas, 493 U.S.
215, 231 (1990); Morrison v. Nat'l Austl. Bank Ltd., supra, 547
F.3d at 170; Arar v. Ashcroft, supra, 532 F.3d at 168; Makarova
v. United States, supra, 201 F.3d at 113.

          2.  Claims Against the
              NLRB and Against Mattina
              in Her Official Capacity

     The NLRB and Mattina argue that the Court lacks subject
matter jurisdiction over plaintiff's claims against it because
the United States has not waived its sovereign immunity concern-

ing those claims.  Plaintiff does not respond in his opposition
brief (Pl.'s Opp. 12-32).  However, plaintiff claims in his
complaint that the Court has federal question jurisdiction and
"deprivation of civil rights related jurisdiction" over his
federal claims pursuant to 28 U.S.C. §§ 1331 and 1343 and supple-
mental jurisdiction over his state claims pursuant to 28 U.S.C.
§ 1367  ("Sections 1331, 1343 and 1367") (Am. 2008 Compl. ¶ 2).
I understand plaintiff to be arguing that the Court has subject
matter jurisdiction over his claims against the NLRB under the
civil rights statutes he cites and the APA.  In addition, plain-
tiff claims, in the first paragraph of his complaint, that the
"NLRB's prosecutorial decisions can be challenged in United
States District Courts when the NLRB's actions violate constitu-
tional Rights such as the violation of the Equal Protection
Rights of any (protected class) plaintiff(s)" (Am. 2008 Compl.
¶ 1, citing Int'l Ass'n of Machinists & Aerospace Workers v.
Lubbers, 681 F.2d 598, 603 (9th Cir. 1982)).

a.  Principles of
Sovereign Immunity

It is well settled that the United States[7] enjoys
sovereign immunity from suits except to the extent that it has
waived such immunity.  United States v. Navajo Nation, 537 U.S.
488, 502 (2003); United States v. Mitchell, 463 U.S. 206, 212
(1983); United States v. Lee, 106 U.S. 196, 206 (1882) (explain-
ing derivation of principle of sovereign immunity and its appli-
cability to United States).  "The waiver of sovereign immunity is
a prerequisite to subject-matter jurisdiction, . . . .'"  Gardens
Assocs. v. United States, 175 F.3d 132, 139 (2d Cir. 1999),
citing United States v. Mitchell, supra, 463 U.S. at 212, and
quoting Blatchford v. Native Village of Noatak, 501 U.S. 775,
786-7 n.4 (1991).  A showing of jurisdiction is not alone suffi-
cient to allow a suit against the United States to proceed -- the
plaintiff must also show a specific waiver of sovereign immunity.

Congress can waive sovereign immunity "through statutes
explicitly establishing a cause of action against the federal
government."  Jones v. Nat'l Commc'n & Surveil. Networks, 409 F.

---

[7]"Because an action against a federal agency or federal
officials in their official capacities is essentially a suit
against the United States, such suits are also barred under the
doctrine of sovereign immunity, unless such immunity is waived."
Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 510 (2d
Cir. 1994), citing Fed. Deposit Ins. Co. v. Meyer, 510 U.S. 471
(1994); see also Brown v. Gen. Servs. Admin., 425 U.S. 820,
826-27 (1976).

Supp.2d 456, 466 (S.D.N.Y. 2006); <u>accord</u> <u>Lehman v. Nakshian</u>, 453
U.S. 156, 160-61 (1981).  "Waivers of sovereign immunity must be
'unequivocally expressed'; the government's consent to be sued is
strictly construed and cannot arise by implication." <u>Diaz v.</u>
<u>United States</u>, 517 F.3d 608, 611 (2d Cir. 2008), <u>quoting</u> <u>United</u>
<u>States v. Nordic Village, Inc.</u>, 503 U.S. 30, 33-34 (1992); <u>see</u>
<u>also</u> <u>Lane v. Pena</u>, 518 U.S. 187, 192 (1996); <u>Lehman v. Nakshian</u>,
<u>supra</u> 453 U.S. at 160-61; <u>United States v. Mitchell</u>, <u>supra</u>, 445
U.S. at 538; <u>United States v. King</u>, 395 U.S. 1, 4 (1969).

> b. The Jurisdictional
> and Civil Rights
> <u>Statutes Cited by Plaintiff</u>

Plaintiff first seeks to assert claims against the NLRB
under the general federal question jurisdiction statute, the
civil rights statutes and the New York human rights statutes.

It is well settled that pure jurisdictional statutes,
such as Sections 1331, 1343 and 1367, "may not be construed to
constitute waivers of the federal government's defense of sover-
eign immunity." <u>Beale v. Blount</u>, 461 F.2d 1133, 1138 (5th Cir.
1972); <u>accord</u> <u>Schuster v. United States</u>, CIV-87-1470E, 1988 WL
134708 at *2 (W.D.N.Y. Dec. 15, 1988); <u>see</u> <u>also</u> <u>New Mexico v.</u>
<u>Regan</u>, 745 F.2d 1318, 1321 (10th Cir. 1984); <u>B.K. Instr'ts, Inc.</u>
<u>v. United States</u>, 715 F.2d 713, 724 (2d Cir. 1983); <u>Doe v.</u>
<u>Civeletti</u>, 635 F.2d 88, 94 (2d Cir. 1980).

Likewise, the civil rights statutes do not unequivo-
cally express the federal government's consent to be sued and,
thus, do not waive its sovereign immunity.  See Brown v. Gen.
Servs. Admin., 425 U.S. 820, 827 n.8 (1976) (no waiver of sover-
eign immunity for federal agencies under Section 1981); Smith v.
Rubin, 141 F.3d 1185, 1998 WL 99019 at *2, *4 (10th Cir. 1998)
(unpublished opinion) (no waiver of federal sovereign immunity
under Sections 1983 and 1985, among others); Gibson v. United
States, 781 F.2d 1334, 1343 (9th Cir. 1986) (no waiver of sover-
eign immunity for federal employees under Section 1983); Jones v.
Nat'l Commc'n & Surveil. Networks, supra, 409 F. Supp.2d at 466
(no waiver of federal sovereign immunity for claims under Sec-
tions 1981, 1983 and 1985, among others); Harrison v. Potter, 323
F. Supp.2d 593, 604 (S.D.N.Y. 2004) (no waiver of federal sover-
eign immunity for claims under Section 1983 and Section 1985).

Needless to say, the state statutes cannot be construed
to waive the federal government's sovereign immunity.  E.g.,
Presidential Gardens Assocs. v. United States, 175 F.3d 132, 139
(2d Cir. 1999) ("The sovereign immunity of the United States may
only be waived by federal statute.").

Thus, plaintiff has not sustained his burden of proving
a specific waiver of sovereign immunity with respect to his
claims against the NLRB and Mattina in her official capacity.
His federal civil rights and state human rights claims against

26

the NLRB, including Mattina in her official capacity, must therefore be dismissed.

c.  <u>The APA</u>

The APA does not provide a jurisdictional basis for plaintiff's claims that the NLRB abused its discretion or violated his constitutional rights by dismissing his charges of discrimination on the basis of race, color or national origin, without any investigation.

The APA provides, in pertinent part, that any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  This provision, however, is limited by another provision of the APA that renders the APA inapplicable "to the extent that -- (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."  5 U.S.C. § 701(a).

The Supreme Court has recognized that the NLRA "preclude[s] judicial review" under the APA of the decisions of the NLRB's General Counsel concerning whether to investigate or dismiss charges concerning violations of the NLRA.  29 U.S.C. § 153(d) ("The General Counsel of the Board . . . shall have <u>final</u> <u>authority</u>, on behalf of the Board, in respect of the

27

investigation of charges and issuance of complaints [concerning unfair labor practices] under section 160 of this title, and in respect of the prosecution of such complaints before the Board . . . ." (emphasis added)); NLRB v. United Food & Commercial Workers Union, 484 U.S. 112, 118, 133 (1987); Vaca v. Sipes, 386 U.S. 171, 182 (1967) ("[T]he Board's General Counsel has unreviewable discretion to refuse to institute an unfair labor practice complaint."); accord Williams v. NLRB, 105 F.3d 787, 791 n.3 (2d Cir. 1996); Bonilla v. NLRB Office of Gen'l Counsel, 92 Civ. 4304 (KMW), 1993 WL 148888 at *1 (S.D.N.Y. Apr. 20, 1993). Under the NLRA, the General Counsel's decisions prior to the commencement of a hearing, including the decision to investigate or to dismiss a complaint, are prosecutorial in nature and not reviewable by the NLRB's adjudicative body or by the courts for abuse of discretion. NLRB v. United Food & Commercial Workers Union, supra, 484 U.S. at 125-26, 131 ("[J]udicial review is expressly provided only in respect of Board orders[;] . . . Congress purposely excluded prosecutorial decisions from this review."); see also Hourihan v. NLRB, 201 F.2d 187, 188 (D.C. Cir. 1953) (no jurisdiction to review Regional Director's decision not to investigate for abuse of discretion).

Courts of Appeal, including the Court of Appeals for the Second Circuit, have recognized that an exception to the general prohibition against judicial review exists when a plain-

tiff alleges a substantial claim that the NLRB's decision has violated the plaintiff's constitutional rights.  Int'l Ass'n of Machinists and Aerospace Workers v. Lubbers, 681 F.2d 598, 603-04 (9th Cir. 1982) (finding that NLRA does not preclude constitutional review of Board's decision to withdraw complaint, but rejecting constitutional challenge because of absence of due process right to hearing before complaint is withdrawn); accord Bova v. Pipefitters & Plumbers Local 60, 554 F.2d 226, 228-29 (5th Cir. 1977); Balanyi v. IBEW, 374 F.2d 723, 726 (7th Cir. 1967); Boire v. Miami Herald Publ'g Co., 343 F.2d 17, 21 (5th Cir. 1965); McLeod v. Local 476, United Bhd. of Indus. Workers, 288 F.2d 198, 201 (2d Cir. 1961) ("[I]f a plaintiff advances a claim of a denial of constitutional rights . . . and the claim is 'not transparently frivolous" the District Court should hear the case."); see Lincoln v. Vigil, 508 U.S. 182, 195 (1993) ("[T]he APA contemplates, in the absence of a clear expression of contrary congressional intent, that judicial review will be available for colorable constitutional claims.").[8]

Plaintiff does not argue that this exception is applicable here, nor does he address how or why any constitutional claim he may have concerning the NLRB's declination of his case

---

[8]An exception to the prohibition against judicial review has also been found where the NLRB acts "in direct and conceded violation of the statute."  This exception to the prohibition against judicial review is inapplicable on its face.

is sufficiently substantial to warrant the application of this exception.  The NLRB's arguments concerning the inapplicability of the exception are essentially unrebutted.

The closest plaintiff comes to invoking this exception is the following statement he makes in an declaration:

> In any event, regardless of whatever "immunity" defenses the NLRB [D]efendants may choose to assert, nobody in America is above the Constitution of the United States and therefore it can be reasonably assumed that even a Government Agency such as the NLRB cannot violate the Fourteenth Amendment of the Constitution and, therefore, cannot OPENLY & BLATANTLY discriminate against Black and other minority employees in (not) enforcing the NLRA law.

(Plaintiff's Declaration in Opposition to Defendants' 12(b)(6) & 12(b)(1) Motion[s] to Dismiss, dated May 11, 2009 ("Pl.'s Decl."), ¶ 4 (capitals and underscoring in original)).  If the foregoing is an attempt to invoke the constitutional-violation exception to the NLRA's prohibition against judicial review, it is fatally flawed in several respects.  First, plaintiff's broad postulate -- that immunity defenses are unavailable against constitutional claims -- is simply wrong.  When the actions of a state actor are in issue, qualified immunity has long been available as a defense to constitutional claims.  See Scott v. Harris, 550 U.S. 372, 377-78 (2007).  Federal agents enjoy the same qualified immunity with respect to constitutional claims. Wilson v. Layne, 516 U.S. 603, 609 (1999).  Thus, plaintiff's

notion that a constitutional claim necessarily trumps immunity doctrines is fundamentally wrong.

Second, if plaintiff is attempting to invoke the exception to the NLRA's prohibition against judicial review for constitutional violations, he has made no showing that his claim is sufficiently substantial to warrant the exercise of subject matter jurisdiction. Plaintiff has done nothing more than allege in a conclusory manner that the NLRB declined his complaint for discriminatory reasons; he does not offer any facts whatsoever that support this conclusion and offers nothing that suggests discrimination played any role in the agency's decision.[9] If plaintiff's bare bones statements are sufficient to pierce the NLRA's prohibition against judicial review of General Counsel's

---

[9]Plaintiff's vague reference to the demographics of the individuals he personally observed in the NLRB's office (see Am. 2008 Compl. ¶¶ 204-05) proves nothing with respect to the NLRB's decisions to reject plaintiff's claims; it does not even prove the actual demographics of the office. Moreover, the notion that the demographics of a decision-maker's support staff provides insight into the reasons for a particular decision borders on the absurd. It would be a very odd world if, for example, a litigant could seek the recusal of a judge, or argue that the judge's decision was tainted with discriminatory animus, based on the demographics of the judge's support staff.

Similarly, plaintiff's vague reference to the NLRB's acceptance of one other complaint involving Columbia (see Am. 2008 Compl. ¶¶ 212-13) proves nothing, especially in the absence of a factual showing the claims are comparable. It would be an equally odd world if a litigant could seek the recusal of a judge simply by identifying one case in which the judge dismissed a claim brought by a member of plaintiff's race and one case in which the judge had sustained a claim brought by a member of a different race.

decisions, that statutory prohibition would quickly become a dead letter; any plaintiff could evade the prohibition by merely stating, without alleging any supporting facts, that the NLRB's decision was discriminatory.

Because plaintiff has not established a viable basis for the Court to exercise subject matter jurisdiction over the claims against the NLRB and Mattina in her official capacity, these claims should be dismissed.

3.   Claims Against Mattina
     in Her Individual Capacity

Plaintiff also seeks to assert his federal civil rights claims, state law claims and abuse of discretion claims against Mattina in her individual capacity.  Mattina argues that plain-tiff's complaints relate solely to prosecutorial decisions for which she is absolutely immune from suit or, in the alternative, that she is entitled to qualified immunity in connection with the events in issue (NLRB Br. 29-41).  Plaintiff responds that Mattina should not be entitled to immunity because he put her on notice that her actions were illegal (Pl.'s Opp. 15-16).  In addition, plaintiff argues that government officials cannot be immune from claims that they violated the constitution because "nobody in America is above the Constitution of the United States" (Plaintiff's Declaration in Opposition to Defendants'

12(b)(6) & 12(b)(1) Motion[s] to Dismiss, dated May 11, 2009 ("Pl.'s Decl."), ¶ 4).[10]

Under applicable Supreme Court precedent, Mattina is absolutely immune from any suit in connection with her decision to dismiss plaintiff's charges.  "Although a qualified immunity from damages liability should be the general rule for executive officials charged with constitutional violations, [the Supreme Court's] decisions recognize that there are some officials whose special functions require a full exemption from liability."  Butz v. Economou, 438 U.S. 478, 508 (1978).  "'[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question.'"  Buckley v.

---

[10]I note in passing that there is a serious question concerning the source of the right Mattina allegedly violated. Plaintiff has no statutory or Due Process right to have his complaints against Columbia investigated or prosecuted.  DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 195 (1989).  If plaintiff is attempting to assert some type of Equal Protection claim, he has failed to allege any facts that give rise to an inference that his membership in a protected class was a factor in Mattina's decisions; although plaintiff makes conclusory claims of discrimination against Mattina, he alleges no facts that support such an inference.  See generally Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950-52 (2009).

Mattina does not address this hole in plaintiff's claims against her.  Although Mattina argues that no constitutional claim should be implied under Bivens v. Six Unknown Agents, 403 U.S. 388 (1971) (NLRB Br. 28-29), she does not address the question of whether any body of law creates a substantive right which plaintiff claims had been violated.  Mattina instead argues that she is entitled to dismissal only on the basis of either absolute or qualified immunity.  Since Mattina does not raise this issue, I limit my analysis of the claims against her in her individual capacity to her immunity defenses.

Fitzsimmons, 509 U.S. 259, 269 (1993), quoting Burns v. Reed, 500 U.S. 478, 486 (1991).

An official's entitlement to absolute immunity is assessed using

> a "functional" approach, looking at "the nature of the function performed, not the identity of the actor who performed it." Forrester v. White, 484 U.S. 219, 229 (1988); see also Bernard v. County of Suffolk, 356 F.3d 495, 503 (2d Cir. 2004). In other words, the critical inquiry is not the official position of the person seeking absolute immunity, but the specific action for which that person seeks immunity.

Mangiafico v. Blumenthal, 471 F.3d 391, 394 (2d Cir. 2006). For example, criminal prosecutors enjoy absolute immunity with respect to actions "intimately associated with the judicial phase of the criminal process," such as "initiating a prosecution." Imbler v. Pachtman, 424 U.S. 409, 430 (1976); accord Schloss v. Bouse, 876 F.2d 287, 289 (2d Cir. 1989). However, they "enjoy at most a qualified immunity with respect to acts that are 'adminis-trative' or 'investigative.'" Schloss v. Bouse, supra, 876 F.2d at 289, citing Taylor v. Kavanagh, 640 F.2d 450, 452-53 (2d Cir. 1981). Thus, when a prosecutor "performs the investigative functions normally performed by a detective or police officer," he or she is entitled only to qualified immunity. Buckley v. Fitzsimmons, supra, 509 U.S. at 273-74; accord Zahrey v. Coffey, 221 F.3d 342, 346-47, 349 (2d Cir. 2000); Moore v. Valder, 65 F.3d 189, 194 (D.C. Cir. 1995).

34

The Supreme Court has held that "agency officials . . . performing certain functions analogous to those of a prosecutor [including the decision to initiate administrative proceedings] should be able to claim absolute immunity with respect to such acts," Butz v. Economou, supra, 438 U.S. at 515, and that the General Counsel's decisions prior to the commencement of a hearing, including the decision to investigate or to dismiss a complaint, are prosecutorial in nature, NLRB v. UFCWU, supra, 484 U.S. at 125-26, 131.  All courts that have addressed the issue have held that the prosecutorial discretion exercised by the General Counsel and, presumably, the discretion exercised by his or her subordinates in carrying out the same functions, is directly analogous to the discretion exercised by criminal prosecutors.  For example, as the Honorable Royce C. Lamberth, Chief United States District Judge for the District of Columbia, has observed,

> to allow plaintiff to sue the General Counsel [in her individual capacity] in the instant case would be analogous to allowing a victim of crime to sue a prose-cutor for failure to prosecute -- admittedly not the situation for which the doctrine of immunity was de-vised, but one from which a prosecutor is equally entitled to be immune.

Fitz v. Commc'ns Workers of Am., Civ. A. 88-1214 (RCL), 1989 WL 226082 at *9 n.11 (D.D.C. Aug. 17, 1989), aff'd mem., 917 F.2d 62, 1990 WL 166506 (D.C. Cir. 1990); see also George Banta Co., Inc. v. NLRB, 626 F.2d 354, 356-67 (4th Cir. 1980) (stating that

"[i]t is the character of the [General Counsel's] decision which is critical" and finding that decision "based essentially upon a determination that the available evidence will not support prosecution of the alleged violation" was "fundamentally prosecutorial"); Assoc. Builders & Contractors, Inc. v. Irving, 610 F.2d 1221, 1224-25 (4th Cir. 1979) ("We think it was the intent of Congress that the General Counsel's discretion as to the issuance of complaints should ordinarily be checked by his political responsibility, not by judicial review.").

Plaintiff challenges both Mattina's decision not to conduct "any meaningful investigation" of plaintiff's charges against Columbia and her prompt dismissal of his first and third sets of charges "apparently without even reading" plaintiff's supporting affidavit, which plaintiff argues frustrated plaintiff's chances of forming a minority employees association (Am. 2008 Compl. ¶¶ 215-16, 223, 228).  To the extent that plaintiff is challenging Mattina's decision to dismiss his charges, the authorities cited above teach that Mattina enjoys absolute immunity with respect to that decision because it is indistinguishable from the decision of a criminal prosecutor to commence or decline a criminal prosecution.

To the extent that plaintiff is challenging Mattina's decision not to conduct an investigation or her failure to conduct a "meaningful" investigation prior to dismissing his

complaint, Mattina is also entitled to absolute immunity.
Brodnicki v. City of Omaha, 75 F.3d 1261, 1267 (8th Cir. 1996)
(finding prosecutor's review of polygraph results presented by
defense counsel covered by absolute immunity); see also Marczeski
v. Handy, 213 F. Supp.2d 135, 141 (D. Conn. 2002) (holding that
"claims based on an alleged failure to investigate c[o]me within
the absolute immunity afforded by Imbler [v. Pachtman, supra, 424
U.S. at 430].") (collecting cases); Trammell v. Coombe, 95 Civ.
1145 (LAP), 1996 WL 601704 at *3 (S.D.N.Y. 1996) ("[T]he decision
not to investigate is so closely intertwined with the decision
not to prosecute that to deny immunity for failure to investigate
would offer an obvious means to circumvent the doctrine of
prosecutorial immunity."); Woolfolk v. Thomas, 725 F. Supp. 1281,
1283 (N.D.N.Y. 1989) ("In this court's opinion the decision not
to investigate is sufficiently closely related to the decision
not to prosecute so as to qualify defendant [prosecutor]'s
decision for absolute immunity." (quotation marks omitted)).

   B.  Barbieri's Motion

        Barbieri moves to dismiss all of plaintiff's claims
against her.[11]  First, Barbieri seeks to dismiss plaintiff's

---

[11]Although Barbieri's motion is directed to the original
complaint in 08 Civ. 8120, I deem it to be directed to the
amended complaint in that action.  Plaintiff's original claims
under Section 1981, the NYSHRL and the NYCHRL were based on
                                              (continued...)

Section 1985(3) and Section 1981 claims, as well as his purported

claims under Fed.R.Civ.P. 11, various attorney codes of conduct

and "other common laws," for failure to state a claim (Barbieri

Br. 1 n.1, 9-11, 13-14).  Second, she seeks to dismiss plain-

tiff's NYSHRL and NYCHRL claims for lack of subject matter

jurisdiction (Barbieri Br. 11-12).  Third, she seeks to dismiss

any remaining claims as barred, in whole or in part, by the

applicable statutes of limitations (Barbieri Br. 12).  Plaintiff

argues in opposition that he has stated facts that satisfy the

elements of a Section 1985(3) claim and a Section 1981 claim

(Pl.'s Opp. 17-27).  Plaintiff does not make any substantive

response to Barbieri's other arguments (Pl.'s Opp. 30-31).

---

[11](...continued)
Barbieri's allegedly aiding and abetting Columbia in "depriving
plaintiff of his NLRA rights" "based on race, color, national
origin and retaliation for complaining thereof" (Orig. 2008
Compl., annexed as Ex. 1 to Friedfel 2008 Decl. 91, ¶ 370).
Plaintiff's amended claim against Barbieri under those statutes
is not substantially different, alleging that Barbieri aided and
abetted Columbia in "depriving . . . plaintiff of his
employee/labor law rights" and "discriminating and retaliating
against . . . plaintiff" based on the same facts alleged against
Barbieri in the original complaint (compare Orig. 2006 Compl.,
annexed as Ex. 1 to Friedfel 2008 Decl., ¶¶ 202-35, 369-73 with
Am. 2008 Compl. ¶¶ 168-203, 338-42).  Accordingly, Barbieri
received fair notice of the nature of plaintiff's amended claims
against her in the original 2008 complaint, and her response to
the original 2008 complaint fairly can be construed to address
those same claims.

1.   Section 1985(3)

Barbieri argues that plaintiff's Section 1985(3)
conspiracy claim should be dismissed because (1) plaintiff fails
to allege an agreement between Barbieri and Columbia, (2) as
Columbia's agent, Barbieri is legally incapable of conspiring
with Columbia, (3) plaintiff fails to allege an agreement between
Barbieri and the NLRB Defendants and (4) plaintiff fails to
allege that Barbieri's participation in any putative agreement
was motivated by discriminatory animus (Barbieri Br. 9-10).
Plaintiff responds that (1) he has shown circumstantial evidence
of agreement akin to the showing made in Adickes v. S.H. Kress &
Co., 398 U.S. 144 (1970) (Pl.'s Opp. 19-22); (2) Barbieri and
Columbia are capable of conspiring with each other because there
are longstanding or multiple instances of discrimination, as
opposed to a single act (Pl.'s Opp. 18-19); and (3) he has
alleged sufficient facts to support an inference of discrimina-
tory animus because he claims that Barbieri conspired to prevent
him from engaging in the protected activity of organizing an
anti-discrimination association (Pl.'s Opp. 20-22, 30-31).

a.   Agreement Between
Barbieri and Columbia

To state a claim under Section 1985(3), a party must
allege:  (1) an agreement among two or more persons; (2) for the

39

purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.  United Bhd. of Carpenters and Joiners v. Scott, supra, 463 U.S. at 828-29; accord Britt v. Garcia, 457 F.3d 264, 269 n.4 (2d Cir. 2006); Gray v. Town of Darien, 927 F.2d 69, 73 (2d Cir. 1991).

Because such claims are "so easily made and can precip-itate such protracted proceedings," the Second Circuit requires that a party alleging a conspiracy to violate civil rights make a "detailed fact pleading" in order to withstand a motion to dismiss.  Angola v. Civiletti, 666 F.2d 1, 4 (2d Cir. 1981); see also Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-56 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level."); Nealy v. Berger, 08-CV-1322 (JFB)(AKT), 2009 WL 704804 at *6 (E.D.N.Y. Mar. 16, 2009) (apply-ing heightened standard for Section 1983 conspiracy claims); Flores v. Levy, 07-CV-3753 (JFB)(WDW), 2008 WL 4394681 at *9 (E.D.N.Y. Sept. 23, 2008) (same); Aikman v. County of Westchester, 491 F. Supp.2d 374, 383 (S.D.N.Y. 2007) (applying heightened standard for Section 1985(3) conspiracy claims); Okoi

v. El Al Israel Airlines, 05 Civ. 5370 (DRH)(WDW), 2006 WL
3501224 at *4 (S.D.N.Y. Dec. 4, 2006) (same).

To satisfy the first element of a Section 1985(3)
claim, a plaintiff "must provide some factual basis supporting a
meeting of the minds, such that defendants entered into an
agreement, express or tacit, to achieve the unlawful end."  Webb
v. Goord, 340 F.3d 105, 110 (2d Cir. 2003) (internal quotation
marks omitted).  The plaintiff must provide "plausible grounds to
infer an agreement," that is, "enough fact to raise a reasonable
expectation that discovery will reveal evidence of illegal
agreement."  Bell Atl. Corp. v. Twombly, supra, 550 U.S. at 556.

Because plaintiff has alleged that Barbieri was Colum-
bia's attorney (Am. 2008 Compl. ¶ 15), he has sufficiently
alleged that they were acting in concert and that there was some
sort of an agreement between Barbieri and Columbia.

b.  Agreement Among
Columbia's Agents

However, plaintiff's allegations regarding the alleged
agreement or agreements between Barbieri and Columbia's employees
all concern actions that Barbieri and Columbia's employees took
in their official roles as Columbia's agents.  Plaintiff does not
allege that any Columbia employee engaged in any relevant conduct
outside of his or her role as a Columbia employee.  Although
plaintiff alleges that Barbieri was motivated by a desire to

41

maximize her fees and her "personal/career advancement," she
allegedly advanced that motive through working on behalf of
Columbia and serving its interests (Am. 2008 Compl. ¶¶ 18, 349-
50).  In the Second Circuit, such contentions are insufficient to
allege that an attorney or employee acted as an independent
person with the legal capacity to conspire.  Girard v. 94th St.
and Fifth Ave. Corp., 530 F.2d 66, 71-72 (2d Cir. 1976) (deci-
sions reflecting collective judgment of two or more persons
nevertheless cannot be considered products of conspiracy under
Section 1985(3) when those persons were officers of corporation
merely carrying out corporation's managerial policy, at least
where plaintiff did not allege that individual defendants were
motivated "by any independent personal stake in achieving the
corporation's objective"); Stoner v. New York City Ballet Co., 99
Civ. 0196 (BSJ), 2002 WL 523270 at *9 (S.D.N.Y. Apr. 8, 2002)
(Extending doctrine to outside counsel; "[T]reating the involve-
ment of a lawyer as the key unlocking § 1985 would discourage
corporations from obtaining legal advice before acting, hardly a
sound step to take." (internal quotations omitted)); accord
Travis v. Gray Comm. Mental Health Ctr., 921 F.2d 108, 111 (7th
Cir. 1990); Buschi v. Kirven, 775 F.2d 1240, 1251-53 (4th Cir.
1985); Doherty v. Am. Motors Corp., 728 F.2d 334, 339-40 (6th
Cir. 1984); Cross v. Gen. Motors Corp., 721 F.2d 1152, 1156 (8th
Cir. 1983); Herrmann v. Moore, 576 F.2d 453, 459 (2d Cir. 1978)

(applying doctrine to trustees of law school); <u>Sathianathan v.</u>
<u>Smith Barney, Inc.</u>, 04 Civ. 7122 (DAB)(FM), 2007 WL 576097 at *5
(S.D.N.Y. Feb. 21, 2007); <u>Roniger v. McCall</u>, 72 F. Supp.2d 433,
437-41 (S.D.N.Y. 1999); <u>Johnson v. Nyack Hosp.</u>, 954 F. Supp. 717,
722-25 (S.D.N.Y. 1997).

Plaintiff's contention that corporate agents can
conspire where there are longstanding or multiple instances of
discrimination, as opposed to a single act is based on decisions
from the First, Third and Eleventh Circuits that are contrary to
the Second Circuit's holdings as well as the other authorities
cited above (Pl.'s Opp. 18-19).  <u>See</u> <u>Stathos v. Bowden</u>, 728 F.2d
15, 20-21 (1st Cir. 1984); <u>Novotny v. Great Am. Fed. Sav. & Loan</u>
<u>Ass'n</u>, 584 F.2d 1235, 1256-59 (3d Cir. 1978) (<u>en</u> <u>banc</u>), <u>rev'd</u> <u>on</u>
<u>other</u> <u>grounds</u>, 442 U.S. 366, 372 (1979); <u>United States v.</u>
<u>Hartley</u>, 678 F.2d 961, 970-72 & n.14 (11th Cir. 1982).  Thus,
these decisions must be rejected in light of the controlling
Second Circuit decisions.

Accordingly, plaintiff has failed to allege a cogniza-
ble conspiratorial agreement between Barbieri and Columbia.

c.  Agreement Between
    Barbieri and
    <u>the NLRB Defendants</u>

Furthermore, plaintiff does not provide any facts
sufficient to give rise to an inference of a meeting of the minds

43

between Barbieri and the NLRB Defendants.  Plaintiff's only allegation concerning an alleged agreement between Barbieri and the NLRB is the following:  "Because defendants Mattina and the NLRB continue to refuse to conduct any (meaningful) investigations/hearings whatsoever (or issue a[n] NLRB complaint), for all practical purposes, the NLRB along with defendant Barbieri have been co-conspirators in Columbia University's continuing 'obstruction of justice' and its illegal policy of 'Apartheid-Style' institutionalized racial discrimination . . ." (Am. 2008 Compl. ¶ 300 (emphasis removed)).  Plaintiff's allegation that both Barbieri and the NLRB Defendants "ha[d] been co-conspirators" is a legal conclusion that is not entitled to the presumption of truth.  Ashcroft v. Iqbal, supra, 129 S.Ct. at 1939.

Moreover, to the extent there is any logic to plaintiff's inference of an agreement, it is profoundly unsound.  All plaintiff has alleged is that Columbia engaged in discriminatory and retaliatory conduct and that the NLRB refused to investigate the matter or to file a charge.  There are no facts alleged that would support an inference that Barbieri ever met with the NLRB before or after it acted, nor are there any facts alleged that would support an inference that Barbieri even knew plaintiff was seeking the intervention of the NLRB.  In fact, apart from plaintiff's conclusory allegations that the Columbia Defendants, Barbieri and the NLRB engaged in conduct that plaintiff believes

44

was illegal or otherwise inappropriate, there is no thread
linking Barbieri to the NLRB.  Given that the Supreme Court "has
repeatedly said that the essence of a conspiracy is 'an agreement
to commit an unlawful act,'" United States v. Jimenez Recio, 537
U.S. 270, 274 (2003), citing Iannelli v. United States, 420 U.S.
770, 777 (1975), United States v. Shabani, 513 U.S. 10, 16 (1994)
and Braverman v. United States, 317 U.S. 49, 53 (1942); accord
United States v. Felix, 503 U.S. 378, 389-90 (1992); Summit
Health, Ltd. v. Pinhas, 500 U.S. 322, 300 (1991), the absence of
any factual allegations from which an agreement or even an
opportunity to reach an agreement could be inferred is fatal to
plaintiff's claim of a conspiracy between Barbieri and the NLRB.
As the Supreme Court has noted in assessing the adequacy of a
complaint under Section 1 of the Sherman Act that alleged only
parallel conduct:

> It makes sense to say, therefore, that an allegation of
> parallel conduct and a bare assertion of conspiracy
> will not suffice.  Without more, parallel conduct does
> not suggest conspiracy, and a conclusory allegation of
> agreement at some unidentified point does not supply
> facts adequate to show illegality.  Hence, when allega-
> tions of parallel conduct are set out in order to make
> a § 1 claim, they must be placed in a context that
> raises a suggestion of a preceding agreement, not
> merely parallel conduct that could just as well be
> independent action.

Bell Atl. Corp. v. Twombly, supra, 550 U.S. at 556-557.  Because
plaintiff has alleged, at most, parallel conduct on the part of

Columbia, Barbieri and the NLRB, he has not adequately alleged a
conspiracy or agreement between Barbieri and the NLRB.[12]

Because plaintiff has not adequately alleged an essen-
tial element of a Section 1985 claim as to Barbieri, that claim
should be dismissed.

   2.   Section 1981

Barbieri next argues that plaintiff has not stated an
aiding and abetting claim under Section 1981 because (1) such a
claim does not exist[13] and, if such a claim exists, (2) plaintiff

_____

   [12]Adickes v. S.H. Kress & Co., supra, 398 U.S. at 144, is
easily distinguishable.  In Adickes, the alleged conspirators --
a Kress manager, a Kress food counter supervisor, a Kress
waitress who denied Adickes service and a Hattiesburg police
officer who arrested Adickes immediately upon leaving Kress --
were in physical proximity to each other and at least had the
opportunity to enter into an agreement.  Adickes, a Caucasian
civil rights advocate and visiting teacher at a "Freedom School,"
alleged in her complaint that, after she and a group of African-
American schoolchildren sat down at the Kress food counter to
eat, a police officer "came into the store 'and observed (Miss
Adickes) in the company of the Negro students,'" and that it was
this same police officer who subsequently arrested Adickes.  398
U.S. at 149.  In addition, three of Adickes' witnesses testified
in their depositions that a policeman came into the store while
Adickes and her students were there, looked at the racially
integrated group, walked to the back of the store, and then left.
398 U.S. at 156-57 & n.13.

   [13]Barbieri stated in her brief that she "agree[d] with and
adopt[ed]" all of the "broadly based" arguments of her co-
defendants (Barbieri Br. 1 n.1).  I interpret this language to
mean that Barbieri intended to incorporate by reference all of
her co-defendants' applicable arguments, including Columbia's
argument that Section 1981 does not contemplate liability for
aiders and abettors (Columbia Am. Br. 14 n.10).

has not alleged sufficient facts to support (a) an inference that
the alleged discrimination concerned the making or enforcement of
a contract or (b) an inference of discriminatory animus (Barbieri
Br. 10-11).  Plaintiff responds that he has alleged sufficient
facts to support a claim that Barbieri had aided and abetted a
hostile work environment and illegal retaliation in response to
allegations of racial discrimination (Pl.'s Opp. 26-27).  Plain-
tiff does not respond to Barbieri's argument that there is no
aiding and abetting liability under Section 1981.

My research has disclosed only one case with a substan-
tive discussion of whether an aiding and abetting claim lies
under Section 1981 -- Long v. Marubeni American Corp., 05 Civ.
639 (GEL), 2006 WL 547555 (S.D.N.Y. Mar. 6, 2006) -- and that
discussion is limited to dicta in a footnote.  In Long, the
Honorable Gerard E. Lynch, United States District Judge, first
compared Section 1981 to the anti-discrimination provisions of
New York State and New York City law and noted that the latter
two statutes expressly prohibited aiding and abetting employment
discrimination while Section 1981 does not.  Judge Lynch then
went on to note that

> it is unlikely that plaintiffs could sustain [a] claim
> for aiding and abetting under [Section 1981].  Cf.
> Central Bank of Denver, N.A. v. First Interstate Bank
> of Denver, N.A., 511 U.S. 164, 177 (1994) ("If . . .
> Congress intended to impose aiding and abetting liabil-
> ity [under Securities Exchange Act § 10(b)], we presume
> it would have used the words 'aid' and 'abet' in the
> statutory text.  But it did not."), superseded in part

47

by 15 U.S.C. § 78t(e); <u>id</u>. at 183 (rejecting the notion that aiding and abetting liability should attach to all federal civil statutes); <u>EEOC v. Illinois</u>, 69 F.3d 167, 169 (7th Cir. 1995) (Posner, J.) ("[W]e find it implausible to impute to Congress an intention to create [in the Age Discrimination in Employment Act], by language not at all suggestive of any such intention, aider and abettor liability of one employer to the employees of another employer.").  <u>But</u> <u>see</u> <u>Hampton v. LSX Delivery</u>, 00 Civ. 6690 (JHL), 2002 WL 31399412, at *3 n.4 (N.D. Ill. Oct. 23, 2002) ("There is no case directly on point regarding whether [plaintiff] may assert a section 1981 claim . . . for aider and abettor liability.").

<u>Long v. Marubeni Am. Corp.</u>, <u>supra</u>, 2006 WL 547555 at *4 n.4.[14]

Section 1981(a) provides that

[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  The text of Section 1981 comes from three sources:  the Civil Rights Acts of 1866, 1870 and 1991.  The language quoted above originated in section 1 of the Civil Rights Act of 1866, enacted pursuant to the Thirteenth Amendment.  The 1866 Act essentially extended the rights enumerated above, as well as the right to "purchase, lease, sell, hold, and convey real and personal property" to "all persons born in the United

---

[14]Judge Lynch then concluded that it was unnecessary for him to resolve the issue because it had not been raised by the parties.

48

States and not subject to any foreign power . . . , any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding."  An Act to [P]rotect [A]ll Persons in the United States in their Civil Rights, and [F]urnish the Means of [T]heir Vindication ("1866 Act"), § 1, 14 Stat. 27, 27 (1866). The Civil Rights Act of 1870 both re-enacted the text of the 1866 Act and enacted new text, pursuant to the Fourteenth Amendment, which extended the protections enumerated in Section 1981 to "all persons within the jurisdiction of the United States," thus extending its protections to foreign-born persons.  An Act to [E]nforce the Right of Citizens of the United States to [V]ote in the [S]everal States of this Union, and for [O]ther Purposes ("1870 Act"), §§ 16, 18, 16 Stat. 140, 144 (1871).  Thus, the current text of Section 1981(a) is the product of both the 1866 Act and the 1870 Act.  <u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701, 721-22 (1989).

        The 1866 and 1870 Acts expressly created criminal remedies for violations of their substantive protections.  Both Acts made it a federal misdemeanor for individuals acting under color of state law or custom to subject any such inhabitant or cause any state inhabitant to be subjected to the deprivation of any right protected by the Acts.  1866 Act § 2, 14 Stat. at 27; 1870 Act § 17, 16 Stat. at 144.  In addition, both acts made it a federal misdemeanor for any person to "aid, abet, or assist" any

49

person in knowingly and willfully obstructing his arrest for criminal violations created by the Acts or in escaping from custody after such an arrest.  1866 Act § 6, 14 Stat. at 28; 1870 Act § 11, 16 Stat. at 142-43.

The 1870 Act included two additional provisions establishing secondary criminal liability.  One section of the 1870 Act made it a federal felony carrying a penalty of up to ten years in prison and a $5000 fine -- far harsher penalties than appear elsewhere in the Civil Rights Acts -- for any two persons to conspire to violate the rights protected by the Acts.  1870 Act § 6, 16 Stat. at 141.  The 1870 Act also made it a crime for any officer of any federal congressional election to "aid . . . any . . . person . . . to do any act . . . made a crime" by any of the preceding sections of the 1870 Act.  1870 Act § 20, 16 Stat. at 145.

In 1871, Congress supplemented these criminal penalties with a civil liability scheme.  First, Congress created civil liability for state actors who deprived persons within the jurisdiction of the United States of the rights, privileges or immunities secured by the Constitution.  An Act to [E]nforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for [O]ther Purposes ("1871 Act"), § 1, 17

50

Stat. 13, 13 (1871).[15]   Second, Congress created civil liability

for participants in conspiracies to perpetrate violations of

federal rights for damages caused by any violations actually

perpetrated.   1871 Act § 2, 17 Stat. at 14.   Third, Congress

provided for secondary civil liability for any person who,

"having knowledge that any of the wrongs conspired to be done and

mentioned in the [section discussing criminal liability] are

about to be committed, and having power to prevent or aid in

preventing the same," neglected or refused to do so.   1871 Act

§ 6, 17 Stat. at 15.   Such persons would be liable for injuries

caused by the wrongful acts that he or she could have prevented

through reasonable diligence.   1871 Act § 6, 17 Stat. at 15.

These civil liability provisions remain in force today as Sec-

tions 1983, 1985 and 1986.

    Although Section 1981's criminal enforcement scheme

"lay virtually dormant" between the 1890s and the 1940s, without

objection from Congress, Harry A. Blackmun, Section 1983 and the

Protection of Individual Rights -- Will the Statute Remain Alive

or Fade Away?, 60 N.Y.U. L. Rev. 1, 11-13 (1985); see also Benno

C. Schmidt, Jr., Principle and Prejudice:  The Supreme Court and

Race in the Progressive Era, Part 3, 82 Colum. L. Rev. 835, 851

---

[15]In 1874, Congress expanded the scope of this section to
include deprivations of rights secured by the Constitution "and
laws."  Rev. Stat. § 1979 (1874); Chapman v. Houston Welfare
Rights Org., 441 U.S. 600, 608-09 (1979).

(1982), Congress never supplemented Section 1981 with a civil
enforcement scheme beyond the provisions discussed above.  In
1948, Congress supplemented the general federal question juris-
diction statute by conferring original jurisdiction on the
district courts over any civil action "authorized by law to be
commenced by any person . . . [t]o recover damages or to secure
equitable or other relief under any Act of Congress providing for
the protection of civil rights . . . ."  28 U.S.C. § 1343.  And
in Jones v. Mayer, 392 U.S. 409 (1968) and Runyon v. McCrary, 427
U.S. 160 (1976), the Supreme Court first announced that Sections
1981 and 1982 reached purely private discriminatory acts, and did
not require any state involvement, due to their being grounded on
the Thirteenth Amendment.

        The Supreme Court subsequently adopted a narrow view of
the scope of activities protected by Section 1981 and eliminated
its applicability to disputes over discriminatory terminations of
employment.  See Patterson v. McClean Credit Union, 491 U.S. 164,
178-82 (1989).  In response, Congress amended Section 1981 to
provide protection against discrimination in "the making, perform-
mance, modification, and termination of contracts, and the
enjoyment of all benefits, privileges, terms, and conditions of
the contractual relationship."  42 U.S.C. § 1981(b).  Congress
also expressed its agreement with the Supreme Court's earlier
decisions finding that Section 1981 applied to private actors.

42 U.S.C. § 1981(c) ("The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.").  There were no other amendments or modifications to Section 1981 in the 1991 Act. Civil Rights Act of 1991, § 101, Pub. L. 102-166, 105 Stat. 1071, 1071-72 (1991).

In sum, Congress did create secondary liability for certain violations of the Civil Rights Acts, including criminal liability for aiding and abetting.  It initially created criminal liability for individuals who aided and abetted civil rights violators to evade apprehension and prosecution in both the 1866 and 1870 Acts.  1866 Act § 6, 14 Stat. at 28; 1870 Act § 11, 16 Stat. at 142-43.  Furthermore, although Congress chose to create harsh criminal penalties as well as civil liability for individu- als who conspired to deprive others of their civil rights, 1870 Act § 6, 16 Stat. at 141; 1871 Act § 2, 17 Stat. at 14, and it even extended civil liability to bystanders who knew of a con- spiracy to violate civil rights and could have, but failed to, prevent injury to the victims, 1871 Act § 6, 17 Stat. at 15, Congress never expressly created civil liability for aiding and abetting a civil rights violation.

Aiding and abetting is fundamentally different from conspiracy-based theories of secondary liability.  See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511

U.S. 164, 176 (1994) ("[A]iding and abetting liability extends beyond persons who engage, even indirectly, in a proscribed activity; aiding and abetting liability reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do."), superseded in part on other grounds by 15 U.S.C. § 78t(e); United States v. Farmer, 923 F.2d 1557, 1564 (11th Cir. 1991) ("[A]s a general proposition, aiding and abetting acts under color of state law is not the same as conspiring with state officials for purposes of collateral estoppel."); United States v. Tyler, 758 F.2d 66, 70-71 (2d Cir. 1985) ("The essence of a conspiracy is proof of a conspiratorial agreement while aiding and abetting requires there be a 'community of unlawful intent' between the aider and abettor and the principal.  While a community of unlawful intent is similar to an agreement, it is not the same."), quoting United States v. Bright, 630 F.2d 804, 813 (5th Cir. 1980).

As the Supreme Court noted in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., supra, 511 U.S. at 182,

> [T]here is no general civil aiding and abetting statute -- either for suits by the Government . . . or for suits by private parties.  Thus, when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors.

Congress instead has taken a statute-by-statute approach to civil aiding and abetting liability. The Court then proceeded to identify seven instances when Congress expressly created civil aiding and abetting liability.  See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., supra, 511 U.S. at 182-83.  Here, as in Central Bank, there is no indication that Congress intended to create civil aiding and abetting liability.

Indeed, the case against reading aiding and abetting liability into Section 1981 is stronger than that in Central Bank.  When the Court decided Central Bank, it confronted a legal landscape in which "all 11 Courts of Appeals [that had] considered the question ha[d] recognized a private cause of action against aiders and abettors under § 10(b) and Rule 10b-5."  Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., supra, 511 U.S. at 192-93 (Stevens, J., dissenting).  Thus, in Central Bank, there was a strong argument that the "settled construction of an important federal statute" -- a construction which "was certainly no wild extrapolation" -- should not have been disturbed.  511 U.S. at 196, 198-99 (Stevens, J., dissenting).

Furthermore, in Central Bank, the Court was construing an implied private right of action in a statute that was completely silent as to the existence, let alone the scope, of such liability.  Accordingly, in the absence of congressional guid-

55

ance, the Court might reasonably have concluded that a "broader and more liberal interpretation" to effectuate the remedial purposes of the statute was appropriate.  511 U.S. at 195 (Stevens, J., dissenting).  Here, there is greater congressional guidance.  Congress expressly created several public and private rights of action; two of its criminal enforcement mechanisms expressly reached both conspirators and aiders and abettors, whereas the civil enforcement mechanisms reached conspirators and individuals who might fail to thwart the conspirators, but no further.  Congress's remedial scheme was comprehensive, and it extended to several discreet categories of secondary actors. "The fact that Congress chose to impose some forms of secondary liability, but not others, indicates a deliberate congressional choice with which the courts should not interfere."  Cent. Bank, supra, 511 U.S. at 184 (majority opinion).  Congress had the opportunity to revisit its remedial scheme as recently in 1991, and it broadened many aspects of the scope of liability while leaving this particular aspect untouched.

          In addition, much of the reasoning articulated by the majority in Central Bank is directly applicable to this case. First, as discussed above, "Congress did not overlook secondary liability when it created the private rights of action" in Section 1981.  Cent. Bank, supra, 511 U.S. at 184.  Second, although extending liability to aiders and abettors of civil

rights violations would make the civil remedy "more far reaching, it does not follow that the objectives of the statute are better served." Cent. Bank, supra, 511 U.S. at 188.  The litigation that such claims would entail might impose burdensome costs unintended by Congress by including every outside contractor that interacted with an aggrieved employee, but do nothing to discourage discrimination in the workplace.  Third, "the rules for determining aiding and abetting liability are unclear, in an area" -- employer-employee relations -- "that demands certainty and predictability." Cent. Bank, supra, 511 U.S. at 188 (citation omitted).  Were such a claim to exist, "[t]he issues would be hazy, their litigation protracted, and their resolution unreliable." Cent. Bank, supra, 511 U.S. at 188-89 (internal quotation and citation omitted).  Moreover, as indicated by the vigorous private enforcement of Sections 1985 and 1986, the absence of aiding and abetting liability does not mean that secondary actors would be free from liability under the Civil Rights laws.  511 U.S. at 191.  Finally, the liability of primary violators under the statute is extremely broad:  all that is required is the "infringement" of any of the rights enumerated under subsection (a) of the statute.  42 U.S.C. § 1981(c).  As a result, there are relatively few cases in which aiding and abetting liability would reach relevant parties that could not be reached as primary violators.

In sum, in light of contemporaneous statutory enact-
ments and the Supreme Court's decision in <u>Central Bank</u>, I con-
clude that there is no claim for aiding and abetting a violation
of Section 1981.  Thus, it is not necessary to consider
Barbieri's other arguments for dismissal.

Accordingly, plaintiff's Section 1981 claim against
Barbieri should be dismissed.

3.   Rule 11, the Codes of Attorney
<u>Conduct and Other Common Laws</u>

Barbieri next argues that plaintiff's claims against
her for violations of Rule 11 of the Federal Rules of Civil
Procedure, the New York Lawyer's Code of Professional Responsi-
bility or the American Bar Association's Model Rules of Profes-
sional Conduct should be dismissed because there is no private
right of action under these provisions.[16]  Further, Barbieri
argues that plaintiff's claim under "other common laws" fails for
vagueness.[17]  Plaintiff does not respond.

_____

[16]I construe plaintiff's claim that Barbieri violated
"American Bar Association [and] New York Bar State Association's
Attorney Code of Professional/Ethical Conduct" to allege a
putative claim under the currently applicable codes of
professional responsibility promulgated by those organizations.

[17]Barbieri makes this argument by incorporating the
arguments of her Columbia co-defendants in her brief (Barbieri
Br. 1 n.1; Columbia Am. Br. 7).

Rule 11, the New York Lawyer's Code of Professional Responsibility and the American Bar Association's Model Rules of Professional Conduct do not create private rights of action for victims of alleged attorney misconduct. Cohen v. Lupo, 927 F.2d 363, 365 (8th Cir. 1991) ("Federal Rule of Civil Procedure 11 grants a court discretion to discipline parties and counsel for conducting litigation in bad faith or in a frivolous and abusive fashion. . . . [T]here can be no independent cause of action instituted for Rule 11 sanctions."); Wentworth v. Hedson, 248 F.R.D. 123, 125 (E.D.N.Y. 2008) (same); Sean Michael Edwards Design, Inc. v. Pyramid Designs, 98 Civ. 3700 (BSJ), 1999 WL 1018072 at *1 (S.D.N.Y. Nov. 9, 1999) (same); see Port Drum Co. v. Umphrey, 852 F.2d 148, 150-51 (5th Cir. 1988) ("If Rule 11 did expand substantive rights, it would be invalid under the Enabling Act. . . . [N]ot even [the potentially ultimate sanction of default] convert[s] Rule 11 . . . into [a rule] that . . . creates new substantive rights."); see also Byng v. Campbell, 9:07-CV-471 (GLS)(DRH), 2008 WL 4662349 at *3 (N.D.N.Y. Oct. 20, 2008) ("The [New York] Code of Professional Responsibility does not provide for a private right of action."); Jones v. J.C. Penney's Dep't Stores, Inc., 03-CV-0920A, 2005 WL 1313442 at *3 (W.D.N.Y. May 31, 2005) (same); Daniel v. Safir, 135 F. Supp.2d 367, 377 (E.D.N.Y. 2001) (same); Zanders v. Jones, 680 F. Supp. 1236, 1239 & n.4 (N.D. Ill. 1988) (ABA Model Rules of Profes-

sional Conduct do not provide private right of action); Model
Rules of Prof'l Responsibility Scope [20] (2002) ("Violation of a
Rule should not itself give rise to a cause of action against a
lawyer nor should it create any presumption in such a case that a
legal duty has been breached.").

Plaintiff's allegation that Barbieri violated "other
common laws" fails due to vagueness.  Plaintiff's reference to
unspecified common laws does not provide Barbieri with notice of
the nature of his claim, which is a threshold requirement for
pleadings under Rule 8.  Fed.R.Civ.P. 8(a)(2); Swierkiewicz v.
Sorema N.A., 534 U.S. 506, 512-14 (2002).

Accordingly, plaintiff's claims against Barbieri for
violations of Rule 11, the New York Lawyer's Code of Professional
Responsibility, the ABA's Model Rules of Professional Conduct,
and "other common laws" should be dismissed.

### 4.  The NYSHRL and NYCHRL

Finally, because I recommend that all federal claims
against Barbieri be dismissed and plaintiff does not allege
subject matter jurisdiction on the basis of diversity, I further
recommend that plaintiff's claims against Barbieri under the
NHSHRL and the NYCHRL be dismissed without prejudice as a matter
of discretion.  28 U.S.C. § 1367; Giordano v. City of New York,
274 F.3d 740, 754 (2d Cir. 2001); Purgess v. Sharrock, 33 F.3d

134, 138 (2d Cir. 1994); <u>Castellano v. Board of Trustees</u>, 937
F.2d 752, 758 (2d Cir. 1991); <u>Pitchell v. Callan</u>, 13 F.3d 545,
549 (2d Cir. 1994); <u>Noble v. Career Educ. Corp.</u>, 07 Civ. 5832
(KMK), 2009 WL 2391864 at *11 (S.D.N.Y. Aug. 4, 2009).

IV.  <u>Conclusion</u>

      For all the foregoing reasons, I respectfully recommend
that the NLRB Defendants' and Barbieri's motions to dismiss
(Docket Items 25 and 43 in 08 Civ. 8120 (PAC)(HBP)) be granted.

V.  <u>Objections</u>

      Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b)(2)
of the Federal Rules of Civil Procedure, the parties shall have
ten (10) days from the date of this Report and Recommendation to
file written objections.  <u>See also</u> Fed.R.Civ.P. 6(a) and 6(d).
Such objections (and responses thereto) shall be filed with the
Clerk of the Court, with courtesy copies delivered to the cham-
bers of the Honorable Paul A. Crotty, United States District
Judge, 500 Pearl Street, Room 735, New York, New York 10007, and
to the chambers of the undersigned, 500 Pearl Street, Room 750,
New York, New York 10007.  Any requests for an extension of time
for filing objections must be directed to Judge Crotty.  FAILURE
TO OBJECT WITHIN TEN (10) DAYS **WILL** RESULT IN A WAIVER OF OBJEC-
TIONS AND WILL PRECLUDE APPELLATE REVIEW.  <u>Thomas v. Arn</u>, 474

U.S. 140 (1985); <u>IUE AFL-CIO Pension Fund v. Herrmann</u>, 9 F.3d

1049, 1054 (2d Cir. 1993); <u>Frank v. Johnson</u>, 968 F.2d 298, 300

(2d Cir. 1993); <u>Wesolek v. Canadair Ltd.</u>, 838 F.2d 55, 57-59 (2d

Cir. 1988); <u>McCarthy v. Manson</u>, 714 F.2d 234, 237-238 (2d Cir.

1983).

Dated:   New York, New York
         August 27, 2009

                                   Respectfully submitted,


                                   HENRY PITMAN
                                   United States Magistrate Judge


Copies mailed to:

Mr. Rajagopala S. Raghavendra
P.O. Box 7066
Hicksville, New York  11802

Tara M. La Morte, Esq.
Assistant United States Attorney
86 Chambers Street
New York, New York  10007

Edward A. Brill, Esq.
Proskauer Rose LLP
1585 Broadway
New York, New York  10036

Charles B. Updike, Esq.
Schoeman, Updike & Kaufman, LLP
60 East 42 Street 39th Floor
New York, New York  10165